United States Court of Appeals
Fifth Circuit

**F I L E D**

September 19, 2007

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 06-20776
Summary Calendar

M GENE MARLIN; OLD NATIONAL BANK,

Plaintiffs-Appellants,

versus

MOODY NATIONAL BANK, N A; MICHAEL S HAZELWOOD,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Texas
Civil Action No. H-04-4443

Before DeMOSS, STEWART, and PRADO, Circuit Judges.

PER CURIAM:[*]

This appeal arises from the district court's grant of summary judgment in favor of Moody

National Bank, N.A. ("Moody Bank") and Michael Hazelwood. M. Gene Marlin and Old National

Bank ("Old National") filed a lawsuit against Moody Bank and Hazelwood alleging conspiracy in

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be
published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

violation of the Racketeer-Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) & 1962(d), common-law conspiracy, and negligence. The district court found the lawsuit to be without merit and granted summary judgment. We affirm the district court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Larry M. Nixon brokered cranes in Texas, and Marlin dealt with cranes in Indiana. In the early 1990s, Marlin purchased a crane from Nixon. This transaction initiated a long-term business relationship between the men. Over the next four years, Marlin purchased four or five additional cranes from Nixon. In 1997, Marlin financed a crane deal arranged by Nixon. Nixon bought a crane, resold it, and then Nixon and Marlin split the profits from the transactions. After completing a few similar transactions, Nixon and Marlin started a company, Delta Mike, Inc. ("Delta Mike"), to broker cranes. Marlin owned 51% and Nixon owned 49% of the company, but the two men agreed to evenly split all profits.

Pursuant to their business agreement, Delta Mike was to identify a crane on the market, locate a buyer, acquire the crane, and finally, re-sell the crane at a profit. The acquisitions were to be funded through loans from different banks. In Houston, Nixon held the responsibility of finding available cranes and willing buyers. To complete each transaction, Nixon sent a sales agreement to Marlin for approval. Marlin then secured financing for the transaction. After securing financing, Marlin would instruct the bank to wire funds to Nixon's account. For many years, Nixon's company, L&D Interests, Inc. ("L&D Interests"), doing business as Delta Crane, bought and sold cranes as the agent of Delta Mike. The bank wired funds to Delta Crane, and after the sale, Nixon paid Delta Mike from the Delta Crane account. Both owners personally guaranteed the loans. Once Nixon bought and resold the crane, he wired the money to Delta Mike's account in Indiana. Marlin repaid the bank, and

2

then, the two men divided the profits.

In August 2001, Nixon opened a personal account and an account for L&D Interests at Moody Bank in Clear Lake City, Texas. Neither account named Marlin as a signatory. In October 2002, at the same Moody Bank branch, Nixon and Marlin opened an account for Delta Mike, doing business as Delta Crane. Marlin wanted Delta Mike to purchase cranes directly and the bank to wire funds directly to the sellers. The Delta Mike account named Nixon and Marlin as signatories. The two men instructed Moody Bank to send the paper statements to Nixon's address in League City, Texas.

During the spring of 2003, Marlin considered selling the business. Marlin mistakenly believed that several companies leased cranes from Delta Mike with an option to buy. Marlin requested that Nixon ask those companies to sign new leases that included an agreement to buy the crane at the end of 2003. When Nixon failed to secure any new leases by July, Marlin visited Texas to meet with three lessees. Only one lessee came to the Delta Mike office to sign the new agreement. Shortly after Marlin returned to Indiana, Nixon faxed executed agreements from the other two lessees. Later that month, Marlin asked Nixon about another outstanding payment. When Nixon never handled the problem, Marlin called the buyer to check on the payment. The buyer denied having any knowledge of the sale, and Marlin realized that Nixon had committed a fraud through their business partnership.

Although some of the lease agreements were legitimate transactions, Nixon fabricated most of the deals. The following provides a brief overview of the fraudulent scheme. Nixon directed a purported seller to prepare an invoice for a crane and send the paperwork to Marlin, but the purported seller did not actually own the bargained-for crane. Next, Marlin approved the sale and requested that a bank fund the acquisition. The bank would send the money directly to the seller.

3

The purported seller kept a share and forwarded the remainder to a bank account controlled by Nixon. Nixon then sent Marlin a fake agreement for a sale or lease showing a positive difference. Nixon kept the gross purchase price received from the bank less the seller's share and Marlin's one-half of the profit.

Between 1997 and October 17, 2002, Nixon defrauded Marlin, First Bank, and Old National on approximately ninety sales transactions. Of the 100 fraudulent transactions orchestrated by Nixon, ninety-five occurred prior to Marlin and Nixon opening the Delta Mike account at Moody Bank. Two of these five transactions were legitimate crane sales.

At one point, Nixon encouraged James Ogden, the owner of Continental Foundation and a Moody Bank customer, to act as a buffer between buyers and sellers to avoid the parties dealing directly with one another. Initially, Michael Morris, a Moody Bank vice-president, handled the accounts of Ogden, Continental Foundation, Nixon, and L&D Interests. Later, Michael Hazelwood managed the accounts. From September 2002 through June 2003, Ogden's account received nine large wire transfers from out-of-state banks. Marlin received paperwork showing Continental Foundation as the seller of the crane. After the money arrived in Ogden's account, Moody Bank transferred the funds to a Nixon-controlled account. Ogden told Morris and Hazelwood that he was acting as a middleman to help Nixon hide the buyers from the sellers. Chris Ogden, Ogden's son, asked Hazelwood about the tax consequences of his father depositing the payments into Continental Foundation's account and then immediately transferring the money. Hazelwood advised the Ogdens to stop accepting the funds if Continental Foundation could not handle adverse tax consequences.

Once the scheme fell apart, Nixon faked his death in a boating accident in Galveston Bay. He was eventually apprehended by authorities. Nixon pleaded guilty to two counts of bank fraud. The

court sentenced Nixon to eighty-seven months of imprisonment. Marlin, on behalf of himself and First Bank, and Old National, sued twenty-five defendants for fraud, negligence, conspiracy to violate RICO, and conspiracy to commit fraud, money laundering, and theft. Marlin and Old National later abandoned their claims against all the parties except Moody Bank and its officer, Hazelwood. Moody Bank and Hazelwood moved for summary judgment. The district court struck certain summary judgment evidence submitted by Marlin and Old National and granted summary judgment in favor of Moody Bank and Hazelwood. Marlin and Old National now appeal.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo, applying the same legal standards as the district court. *Machinchick v. P.B. Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005). In deciding a motion for summary judgment, the court must determine whether the submissions show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Hart v. Hariston*, 343 F.3d 762, 764 (5th Cir. 2003). In deciding whether a fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party. *Reeves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).

We review the district court's evidentiary rulings regarding the admissibility of hearsay for abuse of discretion. *Jon-T Chems., Inc. v. Freeport Chem. Co.*, 704 F.2d 1412, 1417 (5th Cir. 1983). Trial courts have broad discretion regarding the admissibility of expert opinion evidence, which the court of appeals will not disturb unless manifestly erroneous. *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 180 (5th Cir. 1995). Expert opinion testimony is admissible when helpful to the jury in understanding the evidence or determining a fact in issue. FED.R.EVID. 702.

III.  DISCUSSION

To prove a RICO conspiracy under Section 1962(d), a plaintiff must establish that (1) two or more people agreed to commit a particular substantive RICO offense; and (2) the defendant knew of and agreed to the objective of the RICO offense.  *See United States v. Posada-Rios*, 158 F.3d 832, 857 (5th Cir. 1998).  In this case, Marlin alleged a violation of 18 U.S.C. § 1962(c) as the substantive offense.  Section 1962(c) proscribes "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  Marlin alleges that Nixon engaged in three predicate crimes demonstrating a pattern of racketeering activity: (1) bank fraud, (2) mail and wire fraud, and (3) money laundering.

A person cannot be held liable for a RICO conspiracy "merely by evidence that he associated with other . . . conspirators or by evidence that places the defendant in a climate of activity that reeks of something foul."  *Id.* (internal quotations omitted).  "A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor."  *Salinas v. United States*, 522 U.S. 52, 65 (1997).  In other words, the conspirator need not expressly agree to violate the statute, but he must have known and agreed to assist in the underlying criminal offense.  *See United States v. Marmolejo*, 89 F.3d 1185, 1196 (5th Cir. 1996), *aff'd sub nom.*, *Salinas*, 522 U.S. at 65.  Therefore, Marlin and Old National must prove that Moody Bank and Hazelwood knew the criminal nature of Nixon's activities and intentionally acted to assist in the unlawful activity.

Similarly, under Texas law, civil conspiracy requires proof that a defendant agreed to

6

accomplish an unlawful purpose or a lawful purpose by unlawful means. *See Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995). Conspirators must know the object and purpose of the conspiracy, agree to the scheme, and specifically intend to advance the conspiracy. *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996). The "gist of civil conspiracy" is the injury the conspirators intend to cause. *Triplex*, 900 S.W.2d at 720.

Marlin and Old National present no evidence to show that Moody Bank and Hazelwood knew of the sham crane transactions and agreed to assist Nixon in executing the fraud. The bank merely accepted deposits and transferred funds from one customer's account to another. Old National's vice-president conceded this point, stating that "[i]f an authorized signer on an account asks me to move money from one of his accounts to another account, I would do that." These actions alone, without knowledge of the underlying fraudulent crane sales, fail to implicate Moody Bank or Hazelwood as participants in an unlawful conspiracy. Marlin must show that Moody Bank and Hazelwood knew Nixon was inducing Plaintiffs to fund fraudulent crane transactions and agreed to perform ordinary banking functions to assist the criminal fraud.

Marlin and Old National attempt to fulfill their evidentiary burden through a series of red flags that should have prompted Moody Bank and Hazelwood to investigate Nixon's business affairs. First, Nixon asked Moody Bank to transfer funds to and from the Delta Mike account. He explained to a bank assistant that "my partner's coming into town, and we're arguing." Accepting this allegation as true, the direction to transfer funds due to an ongoing disagreement between business partners does not prove Moody Bank's knowledge of Nixon's attempt to conceal fraudulent activity. The bank assistant testified that the request "didn't set off any bells" and "[w]e transferred money for clients all the time." Based on this testimony, the court cannot reasonably infer that the bank assistant

7

knew of and agreed to assist in the underlying fraud.

Second, Marlin asserts that the transfers between Nixon's account and Continental Foundation should have been warning signs. Ironically, Old National dispelled this theory. An Old National officer testified that, "[a]s I sit here today, that does not create a red flag to me as long as the appropriate individual who has authority to move the money, has called to do so." Essentially, the bank transfers constitute routine banking practices. The district court explained that the brokerage business involves keeping the buyer and seller unaware of another's identity in order to protect the middleman's interest. Nixon provided this same explanation to Morris, Hazelwood, and Ogden with regards to the purpose for the transfers. Although Morris denies any knowledge about the transfers, this conflict in the evidence does not alter the analysis because transfers alone do not support a reasonable inference that Hazelwood and Moody Bank knew and agreed to assist in the fraud.

Third, Marlin and Old National suggest that the conversation between Hazelwood and the Ogdens establish Moody Bank's participation in the conspiracy. Everyone involved in the discussion, however, agrees that the men only addressed the tax implications of the intra-bank transfers. According to those present, no one mentioned why Nixon wanted to funnel the money through Ogden's account.

Fourth, Marlin and Old National allege that Hazelwood did not immediately provide Delta Mike's bank records to Marlin, which proves participation in the conspiracy. Hazelwood provided the records, however, on the following day according to bank protocol. Fifth, Marlin and Old National assert that the withdrawal by Nixon's ex-wife after Nixon's fake death establishes Moody Bank's participation. But Moody Bank properly complied with this request to withdraw funds

8

because Nixon's ex-wife was a signatory on the account. Lastly, Marlin and Old National suggest that Moody Bank should have conducted an investigation after Nixon's admission to the crime. This fact provides no support, however, to show Moody Bank's and Hazelwood's knowing participation in the conspiracy to defraud Marlin and Old National. Summarily, Marlin and Old National attempt to string together disjointed facts in support of their conspiracy theory but fail to demonstrate, according to standards set forth in the governing statutes and case law, that Hazelwood and Moody Bank *knowingly agreed to assist* Nixon in a scheme to defraud his business partner.

Marlin and Old National argue, in the alternative, that intent may be established through Marlin and Old National's "deliberate ignorance." Plaintiffs may employ a deliberate ignorance theory when (1) the defendant was subjectively aware of a high probability of the existence of illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct. *Posado-Rios*, 158 F.3d at 875; *United States v. Lara-Velasquez*, 919 F.2d 946 (5th Cir. 1990). According to the Fifth Circuit, under the deliberate ignorance test, the "first prong [] protects a defendant from being convicted for what he should have known." *Lara-Velasquez*, 919 F.2d at 952.

> In other words, the first prong permits a deliberate ignorance instruction only when the Government presents facts that support an inference that the particular defendant subjectively knew his act to be illegal and not when the Government presents facts that tend to support an inference that a reasonable person would have known the act to be illegal.

*Id.* "The key aspect of deliberate ignorance is the conscious action of the defendant–the defendant consciously attempted to escape confirmation of conditions or events he strongly suspected to exist. *Id.* at 951. Here, Marlin and Old National must prove that Moody Bank and Hazelwood had actual knowledge of the underlying illegal conduct. Marlin and Old National fail to establish this prong of

9

the deliberate ignorance test for the same reasons that their claims fail under the ordinary conspiracy theories.

Marlin and Old National also attempt to hold Moody Bank and Hazelwood liable under state law for negligence based on the information that these parties should have known. Under Texas law, however, one cannot agree or conspire to act in a negligent manner. *See Tri v. J.T.T.*, 162 S.W.3d 552, 557 (Tex. 2005). Although the situation may present "good reason to believe" that the "existence and object of the conspiracy could have been discovered . . . by the exercise of the slightest degree of diligence," such evidence alone does not support a reasonable inference of actual knowledge or an intent to participate in the wrong. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 857 (Tex. 1968). Similarly, under RICO, the plaintiff must establish that each defendant knew of, and agreed to assist, the racketeering enterprise. *See United States v. Sutherland*, 656 F.2d 1181, 1192-93 (5th Cir. 1981). To prove a RICO conspiracy, the plaintiff must show that "each defendant must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity." *Sutherland*, 656 F.2d at 1193. Marlin and Old National fail to reconcile their negligence theory with the knowledge and intentionality requirements.

Further, a bank owes a duty of care to customers but not third parties. *Guerra v. Regions Bank*, 188 S.W.3d 744, 747 (Tex. App. 2006). The depository agreement, recognized as a contract between the bank and its customer, named Moody Bank and Delta Mike. *See* TEX. BUS. & COM. CODE § 4.104(a)(5); *see also Am. Airlines Employees Fed. Credit Union v. Martin*, 29 S.W.3d 86, 96 (Tex. 2000); *LaSara Grain Co. v. First Nat'l Bank*, 673 S.W.2d 558, 564 (Tex. 1984). Therefore, Moody Bank served Delta Mike. Marlin, in his individual capacity, was not a bank

10

customer. Accordingly, Moody Bank owed no duty to Marlin. In this appeal, Marlin argues that he was owed a duty as a customer of the bank, but this argument is waived because he argued the exact opposite in the district court. *Aldrup v. Caldera*, 274 F.3d 282, 288 (5th Cir. 2001).

Finally, Marlin and Old National argue that the district court erred in striking summary judgment evidence from the record. Pursuant to the hearsay rule, the district court struck several statements of fact submitted by Marlin and Old National through affidavits and deposition testimony. Based on a review of the record, the excluded evidence reiterates facts presented through other means, and even considering the evidence, nothing in the statements create a genuine issue of material fact. Accordingly, regardless of whether the district court erred in excluding the evidence, its ruling was harmless. *Burleson v. Tex. Dep't of Crim. Justice*, 393 F.3d 577, 583 (5th Cir. 2004).

The district court also disqualified the expert testimony offered by Marlin and Old National. The district court reasoned that "the expert's testimony is neither sufficiently rigorous or technical for him to be allowed to comment on whether the bank has met the law's requirement." More specific to the case, the district court held that "[h]is experience as a bank worker responsible for investigating fraud might be useful as a source of data about the intricacies of wire transfers, but it does not make him eligible to swear to his judgment about this case instead of letting the jurors make that application and evaluation themselves." The court's assessment of the expert's helpfulness in determining Moody Bank's intent to defraud Marlin and Old National comports with the Fifth Circuit's stance that an expert's conclusory assertions regarding a defendant's state of mind are not helpful or admissible. *See Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992). As stated by the district court, an expert's credentials do not place him in a better position than the jury to draw conclusions about a defendant's state of mind. *Id*. Accordingly, we conclude that the district court

11

did not abuse its discretion or manifestly err in striking portions of Marlin's and Old National's summary judgment evidence.

## IV.  CONCLUSION

For the foregoing reasons, we affirm the district court's judgment.